**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

FILED
U.S. DISTRICT COURT
DISTRICT OF NEW MEXICO

'23 DEC 22 PM 1:26

CLERK-LAS CRUCES

| | |
|---|---|
| ERIC JONES, | |
| Plaintiff, | |
| vs. | No. **23 CV 1147** |
| THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOÑA ANA, | |
| Defendant. | **Jury Trial Demand.** |

## NATURE OF THE ACTION

This is an action under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq*; the Rehabilitation Act of 1973 ("RA"), as amended, 29 U.S.C. § 701 *et seq*; and the New Mexico Human Rights Act ("NMHRA"), NMSA 1978, § 28-1-1 *et seq*, to correct unlawful employment practices on the basis of disability and to provide appropriate damages and relief to Plaintiff. As alleged with greater particularity below, Plaintiff alleges that Defendant Board of County Commissioners of the County of Doña Ana ("DAC") has failed to provide reasonable accommodations for his disability.

## JURISDICTION AND VENUE

1.    Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, and 1343.

2.    Plaintiff's action is authorized by 42 U.S.C. § 12117(a), which provides redress under the ADA for disability discrimination in employment; 29 U.S.C. § 794a, which provides redress under the RA for disability discrimination in programs receiving federal financial assistance; and N.M.S.A. 1978, § 28-1-10(J) which allows a complainant under the NMHRA to seek a court trial in lieu of a Human Rights Commission hearing.

1

3.     Plaintiff is a resident of Las Cruces, Doña Ana County, New Mexico

4.     Defendant DAC is a political subdivision of the State of New Mexico with its primary location in Las Cruces, Doña Ana County, New Mexico as well as a governmental entity and local public body as defined by NMSA 1978, §§ 41-4-3(B) and (C), as amended. Pursuant to NMSA 1978, § 4-46-1, all suits or proceedings against a county are to be brought in the name of the board of county commissioners of that county.

5.     Upon information and belief, Defendant DAC employs 501+ employees and is a "program or activity receiving federal financial assistance" as defined in 29 U.S.C. § 794.

6.     Defendant DAC was Plaintiff's employer at all times material hereto, and all employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of New Mexico.

7.     Plaintiff filed a timely discrimination charge under the ADA and RA with the Equal Employment Opportunity Commission and received a Notice of Right to Sue on 09/28/2023. This also satisfies his "administrative options" requirement under the NMHRA.

## GENERAL FACTUAL ALLEGATIONS

8.     Plaintiff has been formally diagnosed with autism spectrum disorder by a licensed psychologist and has been receiving treatment for that condition for years.

9.     Plaintiff's autism causes a deficit in theory of mind, also called "mind blindness," which impairs his ability to explain or predict what others think, know, feel, etc. In particular, this limits Plaintiff's ability to interpret linguistic cues (e.g., identify sarcasm, infer meaning, etc.) and generate purely linguistic constructs (e.g., email, written briefs, etc.) that effectively convey his intended message in a format appropriate to the intended audience and context (e.g., not overly or insufficiently long, not overly or insufficiently detailed, not overly or insufficiently technical, etc.) – particularly for people he does not know well. This significantly increases the

2

time it takes him to complete generative linguistic tasks because Plaintiff typically must revise even short messages repeatedly to minimize the chances of miscommunication.

10.    Plaintiff's autism also causes him to experience social anxiety in public spaces – even in situations involving only friends or family. He is typically able to manage the anxiety effectively using strategies like rehearsal and scheduling, but unanticipated disruptions like unexpected phone calls or unplanned visitors can be disorienting and require Plaintiff to apply additional coping strategies to help him regroup before he is able to resume his work. This necessarily increases the total time it takes him to complete tasks.

11.    Plaintiff's autism also causes him to experience several compulsions, including a compulsion to meet deadlines and a compulsion to complete a task or reach a predetermined stopping point prior to changing activity. Leaving these compulsions unfulfilled frequently induces adverse reactions affecting Plaintiff's physical and mental health. For example, when Plaintiff is at risk of missing a deadline or is forced to leave a task incomplete, it triggers fixation on the deadline or task, severe (or extreme) anxiety, sleeplessness, depression, etc. The effects are often cumulative – for example, the intensity of these responses increases each successive day (including weekends) that plaintiff is forced to leave tasks incomplete.

12.    Plaintiff submitted an application for the IT Training and Support Specialist position with DAC on 10/29/2022 which, among other things, documents Plaintiff's earned BA in K-8 education, M.Ed in Instructional Design, and Ph.D in History, Philosophy, and Policy in Education as well as many years creating and providing training for both children and adults; received notice on 11/16/2022 that DAC had determined that he was qualified for the position and had shared his application with the hiring committee; participated in an interview conducted by a 3-person panel that included then Acting Director of IT, Geof Abruzzi ("ABRUZZI"), and

3

Chief Public Information Officer, Anita Skipper during which he disclosed that he is autistic; received and accepted a job offer on 12/19/2022; and began working for DAC on 01/03/2023.

13.     Plaintiff has widely disclosed his disability to those with whom he works regularly, but formally disclosed his disability to the following key representatives on the dates indicated: Current Director of IT and plaintiff's direct supervisor, Kent English ("ENGLISH"), on or around 01/03/2023, HR Administrators Shawn Spain ("SPAIN") and Erika Garay ("GARAY") (01/22/2023), then Director of HR and current Assistant County Manager, Deb Weir ("WEIR") (01/28/2023), EEO/ADA Specialist, Anai Igoche ("IGOCHE") (01/30/2023).

14.     In addition to being qualified for the IT Training and Support Specialist position as shown by his educational and employment history and confirmed by DAC (see paragraph 12 above) prior to accepting the job offer, Plaintiff is able to perform all essential functions of the position as affirmed by IGOCHE during a meeting on 05/10/2023 and affirmed by ENGLISH on Plaintiff's performance evaluation dated 09/29/2023.

15.     Training developed and presented by then EEO/ADA Specialist and current Director of HR, Meg Haines ("HAINES") and the equivalent training presented by IGOCHE specifies that the ADA protects employees with physical or mental impairments from discrimination, which includes denying reasonable accommodations.

16.     Additional training developed and presented by HAINES and the equivalent training presented by IGOCHE states that interference with a DAC employee's ability to perform his or her expected job duties on the basis of a protected class is discrimination.

17.     On 01/22/2023, Plaintiff sent an 8-page document to SPAIN explaining that, during new-hire orientation, HR instructors had used instructional process and had promoted policies that were likely to have a disparate impact on employees with disabilities. The document

also included citations to peer-reviewed articles that support Plaintiff's concerns and practical suggestions for addressing the issues.

18.     On 01/23/2023, Plaintiff met with SPAIN and GARAY to discuss the document, but they dismissed all of Plaintiff's disability-related issues and suggestions on grounds that DAC needs to "consider what is best for everyone instead of what's best for a few people." Instead, they focused on a single sentence from the document which mentions potentially racist and sexist comments made by participants during one session which they determined required HR to file an internal EEO complaint.

19.     On 01/28/2023, Plaintiff contacted WEIR to express concern that HR had chosen to ignore all of the likely disability discrimination he had described but filed an EEO complaint for potentially offensive comments from other participants. WEIR's response on 01/30/2023 simply thanked him for sharing his concerns and encouraged him to contact IGOCHE if he wished to request accommodations.

20.     On 01/30/2023, Plaintiff forwarded all previous communications to IGOCHE and again stressed his concern that HR was ignoring likely violations of the ADA and the RA. IGOCHE's response on 02/01/2023 simply thanked him for sharing his concerns and affirmed that she is available to discuss accommodations for his disabilities.

21.     On or about 02/22/2023, Plaintiff requested to procure noise cancelling headphones to help him manage auditory stimuli in the office. ENGLISH approved, and the headphones arrived on or about 03/10/2023. Plaintiff has been using them consistently since to listen to white noise while he is working.

22.     On or about 04/19/2023, ENGLISH made Plaintiff aware that DAC had repeatedly "flagged" Plaintiff for violating DAC timekeeping policy by exceeding 40 hours a

5

week. Plaintiff explained that the violations were caused by limitations of his autism (described
in paragraphs 9-11 above), and Plaintiff and ENGLISH discussed possible solutions – ultimately
rejecting solutions like moving to a new cubicle and adjusting Plaintiff's schedule as ineffective,
rejecting solutions like clocking out (or submitting timecard adjustments) when Plaintiff needs to
take time to manage his autism as impractical, and determining that the best solution would be to
reclassify Plaintiff's position as salary-exempt under the Fair Labor Standards Act's ("FLSA")
"Professional Employee" or "Computer-related Employee" exemptions.

23.    Under DAC policies, when an hourly-nonexempt employee works more than 40
hours during a week, the amount beyond 40 hours is accrued as "comp time" which the
employee can use for paid time off ("PTO"). Based on knowledge and belief, when used as PTO,
comp time is paid at the employee's normal hourly rate; however, any comp time not used by the
end of the fiscal year is paid out in a lump sum as overtime.

24.    On or about 04/24/2023, ENGLISH advised Plaintiff that he had pursued a variety
of solutions, but that HR had determined that he, as a department director, did not have the
authority under DAC policy to approve any of the proposed solutions. ENGLISH also advised
Plaintiff that DAC was considering a remote work pilot program to help address a shortage of
office space and that ENGLISH considered Plaintiff a good candidate for the program and would
strongly recommend Plaintiff if the pilot were implemented.

25.    On 04/26/2023, Plaintiff met with Payroll Coordinator, Theresa Lopez, who
confirmed that DAC's payroll and timekeeping systems were capable of handling a
reclassification from hourly to salary-exempt, that updating the system would require minimal
time and effort, and that reclassifying an employee from hourly to salary-exempt would not
affect the employee's compensation or benefits.

26.    On 05/08/2023, Plaintiff emailed IGOCHE to formally request accommodations. In the email, Plaintiff explicitly states that he is seeking accommodations to help prevent future violations of timekeeping policies, briefly describes his disability-related limitations, describes actions already taken (e.g., noise cancelling headphones), recommends reclassification to salary-exempt or a remote work placement as possible solutions and explains how both would accommodate his limitations, and briefly explains why other options he and ENGLISH had considered (e.g., relocation) would be ineffective.

27.    On 05/10/2023, Plaintiff met with IGOCHE to discuss his request. During the meeting IGOCHE outlined DAC's accommodations process and advised that she could take no further action until Plaintiff's primary care physician, Jay Wedel ("WEDEL"), completed and submitted a DAC-provided medical evaluation form verifying his disability and providing medical recommendations. Plaintiff offered to provide additional documentation, including a formal diagnostic report, but IGOCHE advised that it would be unnecessary to provide additional documents unless she requested them. She also reviewed Plaintiff's job description and affirmed that he is able to perform all essential functions. Plaintiff provided more detail about his limitations and examples of how they affect him, and in response to questions from IGOCHE, explained that auditory distractions play only a minor role in causing the policy violations and that he was already using noise-cancelling headphones, so efforts to reduce auditory distractions further (e.g., moving to a quieter cubicle) would likely produce no measurable improvement.

28.    On 05/18/2023, WEDEL submitted the completed medical evaluation form in which he verified Plaintiff's disability, briefly explained Plaintiff's limitations, and listed reclassification as salary-exempt and a remote work assignment as his medical recommendations for accommodating Plaintiff's limitations.

29.     Reclassifying Plaintiff's position as salary-exempt would completely accommodate Plaintiff's limitations by removing barriers to the number of hours he worked, could be implemented in DAC's payroll and timekeeping systems with minimal time and effort, would have no cost to DAC, and should be possible under the FLSA exemption. ENGLISH has also recommended this modification to HR.

30.     Allowing Plaintiff to work primarily remotely (i.e., only coming to the office when his physical presence is necessary) would directly address Plaintiff's limitations by significantly reducing the number and intensity of autism-related reactions that contribute to the policy violations, is feasible with existing DAC technology (which enabled all DAC employees to work remotely during COVID shutdowns), would have no cost to DAC, could be implemented with minimal time and effort, and would have negligible impact on DAC operations because Plaintiff currently performs the vast majority of his essential functions using remote work technology (e.g., MS Teams). ENGLISH has also recommended this modification to HR. Based on knowledge and belief, DAC's refusal to consider this accommodation despite recommendations from both WEDEL and ENGLISH is based on a directive from County Manager, Fransisco Macias, that no employees be permitted to work remotely. Further, the Second, Sixth, Ninth, Tenth, and DC circuits have all held that remote work is a reasonable accommodation, even when current policy prohibits it, provided that the employee is able to perform all essential job functions remotely and it does not constitute an undue hardship to the employer, and EEOC guidelines since 2003 have consistently stated the same. *See, e.g.,* Mosby-Meachem v. Memphis Light, Gas & Water Div., 883 F.3d 595, 606 (6th Cir. 2018) (Finding that refusing to consider an accommodation for remote work because the company president had issued a directive prohibiting remote work constituted evidence that the company had failed to

engage in the interactive process, and therefore of intentional discrimination); U.S. Equal Emp.

Opportunity Comm'n, EEOC-NVTA-2003-1, Work at Home/Telework as a Reasonable

Accommodation (2003).

31.    On 05/18/2023, IGOCHE confirmed receipt of the medical evaluation form.

32.    On 06/05/2023, Plaintiff met with IGOCHE to discuss her initial evaluation.

During this meeting, IGOCHE advised that she had reviewed the medical evaluation form but

was not considering WEDEL's recommendations because they did not align with DAC's internal

policies. She explained that, because they were unsure how to accommodate Plaintiff's

limitations, DAC was planning to take a "guess and check" approach in hopes that it would

eventually arrive at an appropriate accommodation plan. She further indicated that she did not

yet have an initial plan developed, but that she was considering options like reassigning Plaintiff

to a quieter cubicle, requiring Plaintiff to use a checklist to document distractions, and providing

different noise-cancelling headphones. Plaintiff reiterated that he was seeking accommodations

to avoid timekeeping policy violations, pointed out that he had previously explained why most of

the options IGOCHE had presented would not accommodate his limitations, and provided

additional examples to illustrate his limitations, but informed IGOCHE that he was willing to try

whatever solutions DAC proposed.

33.    On 07/02/2023, ENGLISH notified Plaintiff that he had been reassigned to a new

cubicle ("CUBICLE 1") which would ostensibly be quieter than his current work area, and

Plaintiff transferred his equipment the same day.

34.    CUBICLE 1 has half walls with approximately 5 feet of open space between the

top of the wall and the ceiling and is located in an open office environment at the intersection of

two heavily travelled corridors. CUBICLE 1 is directly adjacent to a production area that has a

commercial multi-function copier/printer, a large format printer and a document assembly area with staplers, hole punches, and other similar devices. CUBICLE 1 is approximately 10 feet from a large "bullpen" area that is frequently used for standup meetings and collaboration. CUBICLE 1 does not have a sliding door.

35.    On or about 07/05/2023, Plaintiff began receiving complaints that background noise, including machine noise and conversations, made it difficult for others, including ABRUZZI, to hear him clearly on web-based meetings.

36.    On 07/06/2023, Plaintiff met with ENGLISH and IGOCHE to review and sign the initial Reasonable Accommodation Agreement ("RAA") in which DAC agreed to provide Plaintiff with the noise-cancelling headphones he was already using, to relocate Plaintiff to CUBICLE 1, to provide a sliding door for CUBICLE 1, and to provide a white noise machine if requested. While presenting the RAA, IGOCHE explained that each accommodation was intended to help reduce noise distractions.

37.    The initial RAA lists "salary position" and "remote work" as both the medical provider's recommendations and the accommodations preferred by the employee, provides an approximate cost of $0 for both, and acknowledges that DAC *does not* believe the requested accommodations "would cause significant difficulty or expense to [DAC]." The section for explaining delays in implementation is blank.

38.    During a meeting with ENGLISH on 07/10/2023, Plaintiff admitted that he had been doing a significant amount of work off the clock to avoid further disciplinary action for exceeding 40 hours a week. ENGLISH directed Plaintiff that Plaintiff should never work off the clock, and Plaintiff agreed not to do so again.

39.     On 07/20/2023, ENGLISH informed Plaintiff that DAC had continued "flagging" him for the timeclock policy violations Plaintiff had committed since agreeing not to work off the clock. ENGLISH explained that he knew the violations were caused by Plaintiff's disability and that he had offered to approve the extra hours and pay any overtime from the IT Department's budget to resolve the issue, but that HR had rejected the offer and insisted that Plaintiff comply with the policies.

40.     Plaintiff averaged 3 extra hours per week from January through June of 2023. Extending that average for a full fiscal year, he would earn roughly $6500 in overtime minus any comp time used for PTO. This amounts to roughly 0.001% of the IT Department's $5.4 million published budget for FY 2024 and an infinitesimally small percentage of DAC's nearly $400 million published budget for FY 2024. For comparison, department directors are authorized to unilaterally approve purchases up to $60,000 per transaction using their department budgets. *See, e.g.,* Groff v. DeJoy, 600 U.S. 447, 470, 143 S. Ct. 2279, 2295, 216 L. Ed. 2d 1041 (2023) (holding that the undue hardship defense requires the employer to show that "an accommodation would result in substantial increased costs in relation to the conduct of its particular business.")

41.     On 07/20/2023, Plaintiff emailed IGOCHE to request modification of the RAA because, "it is clear that the current accommodations will not address the primary limitations of [his] disabilities in a way that allows [him] to both perform [his] job at a comparable level to someone without disabilities and comply with the timekeeping policies (i.e., not working overtime and not working off the clock)." Plaintiff reiterated that both he and WEDEL had recommended reclassification as salary-exempt. He also offered several additional solutions including modifications to how his hours are tracked.

42.      Modifying the timekeeping policies by, for example, allowing Plaintiff to accrue as much comp time needed as long as he utilized it all as PTO before the end of the fiscal year so DAC did not have to issue a lump sum payout would directly address Plaintiff's limitations by enabling him to redistribute his hours across the full fiscal year, could be implemented with the current timekeeping or payroll systems, would have no cost to DAC, and would have minimal impact on DAC operations beyond potentially setting up a different process for tracking Plaintiff's comp time if comp time typically accrues as overtime. *See, e.g.,* McMillan v. City of New York, 711 F.3d 120, 128 (2d Cir. 2013) (vacating summary judgement in favor of the defendant partially on grounds that allowing an employee to bank hours to avoid timekeeping violations constituted a reasonable accommodation, and therefore refusing to provide it supported a prima facie case of failure to accommodate.)

43.      On 07/31/2023, Plaintiff met with IGOCHE to discuss his request for revisions to the RAA. During the meeting, Plaintiff provided additional examples of how his limitations lead to timeclock policy violations. IGOCHE advised that she would schedule another meeting when she was ready to discuss making revisions to the RAA.

44.      On 08/08/2023, Plaintiff received a directive explicitly prohibiting further timeclock violations – in particular exceeding 40 hours in a week without prior approval.

45.      On 08/14/2023, Plaintiff emailed ENGLISH to request approval for overtime caused by his disability.

46.      During a meeting with Plaintiff on 08/14/2023, ENGLISH acknowledged Plaintiff's flexibility and attempts to comply with policies but advised that DAC policy prevented him from approving Plaintiff's overtime request. ENGLISH reiterated that he knew Plaintiff's timeclock policy violations were caused by Plaintiff's disability but explained that

12

ENGLISH (personally) was also being penalized for Plaintiff's violations and directed Plaintiff
not to exceed 40 hours in a week again.

47.     On 09/01/2023 IGOCHE advised Plaintiff that the sliding door promised in the
initial RAA had been discontinued. The immediate vicinity of CUBICLE 1 includes a number of
cubicles with doors that have been vacant since at least 07/02/2023 as well as at least one unused
sliding door that had been removed from a cubicle prior to 07/02/2023.

48.     In the "Issues/Concerns" section of a weekly status report submitted on or about
09/05/2023, Plaintiff informed ENGLISH that he had been suffering serious adverse reactions
(including inability to sleep) since 08/08/2023 because of the directive prohibiting further
timeclock violations and that these reactions had been making it progressively harder for him to
manage his disability which, in turn, had been making it progressively more difficult for him to
complete tasks and meet deadlines without sacrificing the quality of work. Plaintiff advised that
he had scheduled an appointment with WEDEL on 09/13/2023 to discuss possible medical
interventions, but pointed out that these would not be long-term solutions.

49.     On 09/07/2023, ENGLISH advised Plaintiff that he and IGOCHE were
considering relocating Plaintiff to another cubicle ("CUBICLE 2") that they thought would be
quieter. Plaintiff reiterated that noise plays only a minor role in causing the timeclock violations,
particularly because he already uses noise cancelling headphones. ENGLISH also explained that
DAC had rejected all recommendations to modify how Plaintiff's time is tracked but indicated
that he would continue to advocate for a remote work assignment – acknowledging that it would
not completely address Plaintiff's limitations, but that it would at least reduce the number and
intensity of autism-related reactions that contribute to the timeclock violations.

50. On 09/7/2023, IGOCHE sent Plaintiff a message to MS Teams requesting a meeting to discuss updates. In response, Plaintiff encouraged IGOCHE to use the Outlook scheduling assistant, as she had previously done, to schedule a meeting any time he showed sufficient availability.

51. During a meeting with Plaintiff on 09/11/2023, ENGLISH advised Plaintiff that DAC remained unwilling to consider any of the recommendations Plaintiff had offered since first requesting accommodations. He also requested an update on Plaintiff's health concerns and indicated that he would convey them to DAC. Plaintiff reminded English that HR had an ongoing legal duty to communicate with him directly regarding his accommodation requests.

52. On 09/14/2023, Plaintiff met with IGOCHE who advised that she was considering several revisions to the RAA – specifically, relocating Plaintiff to CUBICLE 2 because it has a door and is in a quieter area, providing foam ear plugs to use when the fire alarm sounds, and encouraging Plaintiff to remain at his desk for 1-2 minutes when the fire alarm sounds to help avoid crowds. Plaintiff reminded IGOCHE that noise plays only a minor role in causing timeclock policy violations, particularly because he already uses noise cancelling headphones to listen to white noise. He acknowledged the gesture in offering foam ear plugs and a modified fire alarm process, but pointed out that the fire alarm only sounds a few times a year. Plaintiff advised IGOCHE that WEDEL had prescribed medication to help mitigate the most severe adverse reactions induced by the directive from 08/08/2023, and when pressed for details, explained that because he was being forced to leave tasks incomplete and was barely meeting deadlines to avoid timeclock policy violations he had been in a nearly continual state extreme anxiety and had averaged 3 hours of sleep or fewer each night for more than a month.

53. Plaintiff was formally reassigned to CUBICLE 2 on 09/20/2023.

54.    CUBICLE 2 is in the same open office environment as CUBICLE 1 and approximately 50 feet away. It is adjacent to the office entry door and along the main entry corridor. It also has half walls, but one side abuts a solid floor-to-ceiling wall, and it does have a sliding door. The sources of ambient noise are different, but the total amount of ambient noise is not significantly different, and the difference is imperceptible while using noise cancelling headphones to listen to white noise.

55.    On 11/06/2023, DAC awarded a 10% temporary raise until 07/23/2024 to all members of the team overseeing the implementation of a new system, including Plaintiff. For Plaintiff, this amounts to roughly $4018.50, or approximately 62% of the estimated overtime pay he would accrue over a fiscal year, assuming he did not utilize any for PTO. There are approximately 23 members of this team, at least some of whom have salaries that are significantly higher than Plaintiff's, but assuming for these purposes that each of them receive a comparable raise, it amounts to $92,425.50 in total. Based on knowledge and belief, DAC approved this amount outside of the project budget process, in a new fiscal year but outside of the new fiscal year's budget process, and after the project had been underway for 8 full months.

56.    On or about 12/11/2023, ENGLISH notified Plaintiff that, as part of a county-wide effort to help alleviate the severe shortage of workspace at the Doña Ana County Government Center ("GOVERNMENT CENTER"), ENGLISH would be reassigning Plaintiff to a satellite DAC building ("ELKS BUILDING"). Plaintiff received his keys to the new building on 12/21/2023. Comparing the shortest routes, the ELKS BUILDING is several miles further away from the GOVERNMENT CENTER than Plaintiff's home is. Neither the GOVERNMENT CENTER nor the ELKS BUILDING contain any specialized equipment that Plaintiff utilizes in the performance of his job. [Note: It is necessary to clarify that, based on knowledge and belief,

this relocation was a unilateral decision by ENGLISH in response to a county-wide effort. HR was not involved in the decision in any way related to their obligation to provide reasonable accommodations for Plaintiff's disability.]

57.    On 12/14/2023, Plaintiff sent an email to HAINES in which he provided a summary of the challenges he had faced as part of his request for reasonable accommodations for the limitations of his disability. As a courtesy, he explicitly stated that, because the 90-day deadline set in the Right to Sue letter was approaching, he would file a legal complaint on 12/22/2023 in order to avoid losing the opportunity to protect his rights as a disabled person. He also explicitly stated that he remained open to negotiation or mediation, but would not delay filing his complaint unless a reasonable settlement could be reached prior to 12/22/2023. He also explicitly reminded HAINES that DAC has an ongoing duty to participate in the interactive process in good faith. As another courtesy, Plaintiff attached an earlier draft of this complaint. ENGLISH, Assistant County Manager Jonathan Macias ("MACIAS"), WEIR, and IGOCHE were all copied on the email. As of this filing, Plaintiff has not received any direct communication from HR, IGOCHE, MACIAS, or WEIR in response to this email.

58.    On 09/28/2023, the EEOC issued Plaintiff a Notice of Right to Sue.

## STATEMENT OF CLAIMS

59.    The allegations contained in the foregoing paragraphs are hereby incorporated by reference with the same force and effect as if fully set forth herein.

60.    Since at least January 2023, Defendant DAC has engaged in unlawful employment practices in violation of §§ 102(a) and 102(b) of the ADA, 42 U.S.C. §§ 12112(a) and (b); § 504 of the RA, 29 U.S.C. § 794; and § 2(A) and (J) of the NMHRA, NMSA 1978, § 28-1-7(A) and (J).

61.     Plaintiff is a qualified person with a disability under §§ 3 and 101(8) of the ADA,

42 U.S.C. §§ 12102 and 12111(8); § 7(20)(B) of the RA, 29 U.S.C. § 705(20)(B); and § 1(A) and

(M) of the NMHRA, NMSA 1978, § 28-1-2(A) and (M).

62.     Plaintiff is autistic which substantially impairs his neurological functions (see,

e.g., paragraphs 9-11 above) and major life activities including communicating, concentrating,

and caring for himself. Autism is explicitly identified in 29 CFR § 1630.2(j)(3)(iii) as an

impairment "that consistently will meet the definition of 'disability'."

### CLAIM FOR RELIEF – FAILURE TO ACCOMMODATE

63.     The allegations contained in the foregoing paragraphs are hereby incorporated by

reference with the same force and effect as if fully set forth herein.

64.     DAC is aware of Plaintiff's disability - as described in paragraphs 12 – 13 above.

65.     DAC has repeatedly found that Plaintiff is qualified for and able to perform the

essential functions of his job - as described in paragraphs 12 and 14 above.

66.     Plaintiff explicitly requested accommodations for his limitations - as described in

paragraph 26 above.

67.     Since initially requesting accommodations, Plaintiff has promptly provided all

requested documents, responded to all material communications within 1 business day, accepted

and participated fully in all requested meetings, provided as much detail about his limitations as

possible, and openly raised concerns as described generally in paragraphs 27-57 above.

68.     DAC has demonstrated its failure to engage in the interactive process to determine

reasonable accommodations for Plaintiff's limitations ("INTERACTIVE PROCESS") in good

faith by completely disregarding the medical recommendations provided by WEDEL without

seeking further clarification - as described in paragraphs 27-32 and 36-37 above. Spurling v. C &

M Fine Pack, Inc., 739 F.3d 1055, 1061-62 (7th Cir. 2014) (finding that disregarding a medical

evaluation without pursuing further collaboration or clarification from the doctor constituted a failure to engage in the interactive process in good faith).

69.     DAC has demonstrated its failure to engage in the INTERACTIVE PROCESS in good faith by repeatedly disregarding plaintiff's concerns and rejecting Plaintiff's recommendations, as described generally in paragraphs 17-57 above, without providing any indication that they would constitute an undue hardship. US Airways, Inc. v. Barnett, 535 U.S. 391, 402, 122 S. Ct. 1516, 1523, 152 L. Ed. 2d 589 (2002) (holding that rejecting a facially reasonable accommodation requires the employer to show with specificity that there are special circumstances that would cause the accommodation to pose an undue hardship under those particular circumstances).

70.     DAC has demonstrated its failure to engage in the INTERACTIVE PROCESS in good faith by disciplining Plaintiff, an employee with a known disability, for policy violations it knows, or has reason to believe, were caused by the limitations of that disability – even after Plaintiff requested accommodations to address the material limitations and then requested revisions to the provided accommodations because they were not effective, and after ENGLISH had offered to approve the policy violations to avoid the need to discipline Plaintiff - as described generally in paragraphs 22-57 above. This is necessarily disciplining Plaintiff *because of* his disability. McMillan v. City of New York, 711 F.3d 120, 129 (2d Cir. 2013).

71.     DAC has demonstrated a failure to engage in the INTERACTIVE PROCESS in good faith by granting a temporary raise to members of a project team outside standard budget processes as described in paragraph 55 above, but refusing to allow ENGLISH to choose to approve Plaintiff's overtime and pay it out of the department's budget despite the fact that the estimated overtime is well below the amount that department directors are able to unilaterally

approve in a single transaction, the fact the estimated overtime amounts to approximately 0.001% of the department budget, and the fact that the temporary raise for 9 months amounts to roughly 62% of the estimated overtime for 12 months as described in paragraphs 40 and 55 above. This also suggests that even the most expensive accommodation option would not constitute an undue burden to DAC.

72.    DAC has demonstrated its failure to engage in the INTERACTIVE PROCESS in good faith by promising accommodation (e.g., a sliding door) before ensuring it could provide them as described in paragraphs 36 and 47 above.

73.    DAC has demonstrated its failure to engage in the INTERACTIVE PROCESS in good faith by failing to perform due diligence to ensure that modifications it offered as accommodations would actually provide the promised outcomes (e.g., that CUBICLE 1 and CUBICLE 2 would be quieter than the previous location) as shown in paragraphs 33-35 and 52-54 above.

74.    DAC has demonstrated its failure to engage in the INTERACTIVE PROCESS in good faith by not communicating directly with Plaintiff regarding his request for reasonable accommodations since September and not taking any discernable action despite Plaintiff's request for revised accommodations remaining unresolved, HR's awareness that Plaintiff was experiencing ongoing severe harm to his mental and physical health as a direct result of HR's failure to provide reasonable accommodations, and Plaintiff's explicit reminder about DAC's ongoing duty to participate in the INTERACTIVE PROCESS in good faith.

75.    Noise cancelling headphones were not a reasonable accommodation for purposes of the initial RAA because HR was aware that Plaintiff had already been using them for 2 months prior to requesting accommodations and 4 months prior to implementation of the RAA, and they

had already proven ineffective for addressing the limitations for which Plaintiff requested accommodations – as described in paragraph 26 above. *See, e.g.,* US Airways, Inc. v. Barnett, 535 U.S. 391, 400, 122 S. Ct. 1516, 1522, 152 L. Ed. 2d 589 (2002) (holding that "[a]n *ineffective* "modification" or "adjustment" will not *accommodate* a disabled individual's limitations")(Emphasis in the original).

76.    Relocation to CUBICLE 1 was not a reasonable accommodation because Plaintiff had repeatedly made HR aware before the initial RAA was implemented that relocation to CUBICLE 1 would not modify Plaintiff's situation in any way material to the limitations for which Plaintiff had requested accommodations – even assuming that it would provide the intended outcome (i.e., reduced ambient noise) as described in paragraphs 26-27 and 32 above.

77.    Relocation to CUBICLE 2 was not a reasonable accommodation because it did not change Plaintiff's situation in any way material to the limitations for which Plaintiff had requested accommodations, and relocation to CUBICLE 1 had already been proven ineffective for addressing those limitations as described in paragraphs 41-54 above.

78.    Even assuming that the proposed modifications were reasonable accommodations, taking 2 months to implement an RAA that included an accommodation (noise cancelling headphones) that Plaintiff had already been using for 2 months before requesting accommodations and an accommodation (relocation to CUBICLE 1) that could have been provided immediately, as described in paragraphs 27 and 47 above, constitutes an undue delay. *See, e.g.,* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2003-1, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA (2002) (stating that failure to proceed as expeditiously as possible is a violation of the ADA). The same is true of taking 2 months after Plaintiff requested revisions to relocate Plaintiff to CUBICLE 2.

79.    Further, there are several accommodations that DAC could have provided on a temporary basis either as a temporary accommodation to mitigate ongoing harm until a more permanent solution could be found or as a trial period to evaluate the effectiveness and impact of the accommodation – including granting temporary permission to work remotely or granting a temporary amnesty for timeclock policy violations related to the limitations of Plaintiff's disability. These could have been granted at any time without any significant impact on county operations, and the failure to do so despite knowing that Plaintiff was experiencing ongoing harm also constitutes an undue delay.

80.    IGOCHE is highly knowledgeable regarding the ADA as evidenced by the fact that her job involves managing all requests for disability accommodations and the fact that she provides trainings on DAC's legal responsibilities under the ADA - as described in paragraphs 15-16 above.

81.    HAINES, IGOCHE's supervisor, is also highly knowledgeable regarding the ADA because she held the EEO/ADA Specialist position and developed the trainings described in paragraph 75 before being promoted to HR Director - as described in paragraphs 15-16 above.

82.    DAC has demonstrated reckless indifference to Plaintiff's federal and state-protected rights as a person with disabilities ("RECKLESS INDIFFERENCE") by refusing to consider modifying its practices and policies despite credible evidence that they had a disparate impact on people with disabilities as described in paragraphs 17-20 above.

83.    DAC demonstrated RECKLESS INDIFFERENCE when it knew, or had reason to believe, prior to implementing the RAA that the modifications included in the RAA would not accommodate Plaintiff's limitations but implemented them anyway and then disciplined Plaintiff and ENGLISH for Plaintiff's disability-related policy violations over ENGLISH's objections.

84.    DAC has known since at least 07/20/2023 that the modifications included in the RAA do not accommodate Plaintiff's limitations, but the only discernable response has been to relocate Plaintiff again despite know relocation did not accommodate Plaintiff's limitations.

85.    DAC has been aware since at least 05/08/2023 that there are several modifications that would completely, or at least directly, address Plaintiff's limitations and could have been implemented with little or no cost and little to no impact on DAC operations. All of these were supported by ENGLISH and several were also recommended by WEDEL, has continually refused to consider any of them without any valid justification.

86.    It is widely accepted that HR is unwilling to consider remote work for any reason based on the directive from the County Manager as described in paragraph 30 above. Even if HR were not simply applying a blanket ban on a particular accommodation, which is a clear indication of failure to engage in good faith, Plaintiff's relocation to the ELKS BUILDING (as described in paragraph 56 above) clearly establishes that ENGLISH believes Plaintiff can effectively perform all essential job functions outside of the GOVERNMENT CENTER, that distance between work location and the GOVERNMENT CENTER is not a significant factor, and that there are no logistical or procedural barriers preventing Plaintiff from travelling to the GOVERNMENT CENTER on the rare occasions when his physical presence is necessary – therefore, any justification for refusing to grant remote work is simply pretense.

87.    DAC has known since at least 09/05/2023 that, because of Plaintiff's disability, its ultimatum prohibiting Plaintiff from further timeclock policy violations has been both interfering with Plaintiff's ability to do his job and causing Plaintiff to experience significant adverse reactions for which he has had to seek medical help repeatedly. Despite this, as described generally in paragraphs 26-57 above, DAC has not directly communicated with Plaintiff

22

regarding his request for reasonable accommodations since September, has left Plaintiff's

07/20/2023 request for revisions to the RAA unresolved, and has taken no other discernable steps

to mitigate the ongoing harm to Plaintiff's physical and mental health or to address the cause by

providing reasonable accommodations. DAC has also refused to consider medical advice and

recommendations from both Plaintiff and ENGLISH despite acknowledging that none of the

recommendations would have any cost or present an undue hardship to DAC, as well as choosing

not to provide any temporary adjustments until reasonable accommodations could be provided.

Given that both IGOCHE and HAINES are highly knowledgeable regarding the ADA, these

actions and inactions combined with HR's unwillingness to consider modifying structures and

behaviors despite being presented credible evidence that they have a discriminatory impact on

people with disabilities (as described in paragraphs 17-20 above) clearly establish a pattern of

RECKLESS  INDIFFERENCE, and therefore constitute intentional discrimination. *See, e.g.,*

E.E.O.C. v. Fed. Express Corp., 513 F.3d 360, 377 (4th Cir. 2008) (finding that a failure to act on

the mere possibility that not providing an accommodation could cause harm to the plaintiff or

others combined with an awareness of the ADA's requirement to provide reasonable

accommodations was sufficient to establish that the employer acted "reprehensibly" (a higher

standard than required for compensatory damages) and to justify punitive damages).

### DEMAND FOR JURY

Plaintiff requests a jury trial.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

A.      Order Defendant to provide Plaintiff with one or more of the reasonable

accommodations presented in paragraphs 29-30, 39-40, and 42 above or an alternative that

equally accommodates Plaintiff's limitations.

B.      Order Defendant to institute and carry out policies, practices, and programs which ensure equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of its past and present unlawful employment practices – preferably in consultation with disabled employees or a recognized disability rights advocacy organization.

C.      Order Defendant, for accountability purposes, to publicly acknowledge on its website and in local newspapers its unlawful treatment of employees with disabilities and describe the efforts it is taking to address letter B above.

D.      Order Defendant to make whole Plaintiff by providing compensation for past and future pecuniary and non-pecuniary losses resulting from the unlawful practices described above, including, but not limited to, inconvenience, emotional pain and suffering, anxiety, stress, and loss of enjoyment of life, in amounts to be determined.

E.      Award Plaintiff the costs for this action.

F.      Grant such further relief as the Court deems necessary and proper.

Respectfully submitted,

Eric F. Jones
Plaintiff

24

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Eric F. Jones

## DEFENDANTS

The Board of County Commissioners for the County of Doña Ana

**(b)** County of Residence of First Listed Plaintiff  **Doña Ana**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  **Doña Ana**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [x] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
ADA as amended 42 U.S.C. § 12101 et seq; Rehabilitation Ace as amended 29 U.S.C. § 701 et seq

Brief description of cause:
Defendant as employer has failed to accommodate Plaintiff's (as employee) disabilities

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE
Dec 22, 2023

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____